**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** )  ) | |
| **v.** ) | **Case No. 1:21-cr-39-RJC-7** |
| ) | |
| **JULIE ANN JOHNSON** ) | |

**MEMORANDUM OPINION**

**Robert J. Colville, United States District Judge**

In May of 2022, a grand jury returned a superseding indictment against Hertel & Brown Physical and Aquatic Therapy ("Hertel & Brown") and twenty individuals, charging them with health care fraud and conspiracy to commit health care and wire fraud. Among those charged was Julie Ann Johnson ("Johnson"), a licensed physical therapist and former employee of Hertel & Brown. After a five-week trial, a jury acquitted Johnson on the conspiracy charge but convicted her of health care fraud. Johnson now requests a judgment of acquittal on the charge of health care fraud or, alternatively an order vacating the verdict and granting a new trial. ECF No. 1826. For the reasons that follow, Johnson's motion will be denied.

## I.    INTRODUCTION

Hertel & Brown was a physical therapy practice founded by Aaron Hertel and Michael Brown in Erie, Pennsylvania. In November 2020, FBI Special Agent Michael Thoreson commenced an investigation into Hertel & Brown based upon a complaint that the agency had received. As part of this investigation, law enforcement agents executed search warrants at the various offices of Hertel & Brown on February 23, 2021. This included a search of the West Erie Plaza office where Johnson worked. Among those present for the search were Agent Thoreson and fellow FBI Special Agent James Rogers.

1

During the course of the search, numerous Hertel & Brown employees were interviewed. Agent Rogers interviewed Johnson and later prepared an FBI 302 report of the interview in which he attributed certain incriminating statements to Johnson.

In November of 2021, the United States obtained a criminal indictment against Hertel & Brown, its two founders, and eighteen of its employees, including Johnson. ECF No. 1.  On May 10, 2022, the grand jury returned a superseding indictment which charged all of the same Defendants with one count of conspiracy to commit healthcare and wire fraud (Count One) and one count of healthcare fraud (Count Two).  ECF No. 425. According to the superseding indictment, the Defendants submitted false or inflated insurance claims through a variety of machinations. This included, *e.g.*: using unlicensed technicians to provide treatment for patients while billing those treatments as though they had been rendered by a licensed physical therapist ("PT") or physical therapist assistant ("PTA"); allowing PTAs to perform joint-mobilizations or other functions they were not licensed to undertake, while billing those services as though they had been performed by a PT; billing for group therapies as though each patient had received individualized treatment; and utilizing billing codes with higher reimbursement rates that did not correspond to the treatment provided.  The superseding indictment listed numerous days when the practice billed an impossible number of treatment hours based on the providers who were working that day and the hours of operation.  It also listed days where the practice had billed for treatments supposedly rendered by a provider who was actually off work or out of the country.

Ultimately, most of the Defendants charged in the Superseding Indictment entered into negotiated plea deals.  Only Johnson and two other individuals proceeded to trial.

In its case-in-chief, the United States presented numerous witnesses who had been employed at Hertel & Brown as technicians, PTAs, PTs, or some combination thereof.  These

witnesses testified to the inappropriate billing practices they had observed and engaged in while working at Hertel & Brown.  Some of these employees implicated Johnson as someone who knew about and participated in the inappropriate billing practices.

Agent Thoreson testified for the Government regarding the data he had collected and analyzed in the course of his investigation.  He discussed instances where it appeared Johnson had billed for an impossible number of individualized treatment hours or where a treatment note had been finalized in her name on a day when she was not working.

Another witness for the Government was Kristen Legters, Associate Dean of the School of Rehabilitative Sciences at Gannon University, where Johnson had obtained her degree in physical therapy.  Dean Legters spoke to the course of study that Johnson would have undertaken at Gannon University.  Among other things, the curriculum included instruction on the Pennsylvania Practice Act for physical therapists, which outlines the permissible practices in the field of physical therapy and proscribes various impermissible practices.

The Government also presented two investigators -- Special Agent Rogers and Richard Jones, a professional conduct investigator for the Pennsylvania Department of State -- each of whom had spoken to Johnson about the billing practices of Hertel & Brown.  Both of these witnesses testified to certain admissions Johnson made about her knowing involvement in the improper billing activity.

Although Johnston exercised her Fifth Amendment right not to testify at trial, she presented numerous witnesses to testify on her behalf.  These witnesses included: George "Ehren" Trost, her current employer; Eileen Perino, a former patient of Johnson's; Karen Rose, a former co-worker at Hertel & Brown; Jane Kaufmann, a specialist in the area of pelvic floor dysfunction and biofeedback therapy who trained and mentored Johnson in 2012; Sean

3

Langford, a private investigator formerly employed as a special agent for the FBI; Scott Miller, a cousin of Johnson's who is now a licensed physical therapist; Andrew Angert, a former coworker of Johnson's who worked as a technician at Hertel & Brown; Deborah Lindabery, an expert in the area of outpatient physical therapy clinic compliance; James Trainum, a consultant on police practices; and her husband, Thomas Johnson.

Most of these witnesses testified to Johnson's character as a person of integrity who is trustworthy. However, there were other aspects to Johnson's defense. Karen Rose, for example, testified about Johnson's demeanor the day after she was interviewed by Agent Rogers.

Jane Kaufmann discussed the treatment of pelvic floor dysfunction, a specialty area which she described as best suited for one-on-one treatment because it involves a patient's highly sensitive and personal information. Ms. Kaufman asserted that it would be appropriate for a clinician like Johnson who provides biofeedback treatment for pelvic floor patients to bill that treatment as a form of neuromuscular reeducation (or "NMR") -- a code that afforded higher reimbursements and was shown to be frequently utilized at Hertel & Brown. Ms. Kaufman further suggested that it would be appropriate for a clinician rendering this care to seek billing guidance from her employer.

Sean Langford provided information about the salary ranges for PTs and PTAs practicing in the Erie area during the years 2018-2019. This information was used to counter evidence that Johnson had received large bonuses that were tied to the practice's profits from fraudulent billing.

Deborah Lindabery testified about the complexities of compliant coding and billing in the setting of an outpatient physical therapy clinic. Among other things, Ms. Lindabery testified that

many physical therapists are not trained in how to properly code for their treatments, and it is reasonable for them to look to their employers or coworkers for guidance in this area.

Mr. Trainum testified as an expert in the area of law enforcement investigative techniques, including interview and interrogation practices.  Mr. Trainum opined as to the "accusatory method" of police interrogation, which he identified as a method historically used by the FBI.  He opined as to how certain aspects of the "accusatory method" can lead to unreliable admissions or confessions.  N.T. Trial, April 15, 2025, ECF No. 1741 at 137-149, 158-160.  Mr. Trainum also offered his opinion as to how interviews can become contaminated when the investigating agent utilizes leading questions, improperly discloses information about the case that is generally unknown, or otherwise signals his desired answer to the interview subject.  *Id*. at 149-152.  Additionally, Mr. Trainum testified about the FBI's use of 302 reports to summarize witness interviews and opined as to the factors that make this form of documentation less reliable than a videotaped or audio recorded interview.  *Id*. at 152-156, 170.

On April 23, 2025, the jury returned a verdict finding Johnson not guilty of conspiracy but guilty of health care fraud.  ECF No. 1576; N.T. Trial, April 23, 2025, ECF No. 1746 at 7-8.  Each jury member was polled and affirmed the verdict.  *Id*. at 9-12.  Johnson subsequently filed this motion for relief under Rules 29 and 33 of the Federal Rules of Criminal Procedure.

## II.    LEGAL STANDARD

### A.  Rule 29

With respect to a motion for judgment of acquittal bought pursuant to Fed. R. Civ. P. 29, the United States Court of Appeals for the Third Circuit has explained that:

> [A] district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" *United States v. Smith*, 294 F.3d 473, 476 (3d Cir.2002) (quoting *United States v. Wolfe*, 245 F.3d

257, 262 (3d Cir.2001)). A finding of insufficiency should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir.1984)). Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury. *See United States v. Jannotti*, 673 F.2d 578, 581 (3d Cir.) (*en banc*) (trial court usurped jury function by deciding contested issues of fact), *cert. denied*, 457 U.S. 1106, 102 S. Ct. 2906, 73 L.Ed.2d 1315 (1982); *see also* 2A Charles A. Wright, FED. PRAC. & PRO. (Criminal 3d) § 467 at 311 (2000) ("A number of familiar rules circumscribe the court in determining whether the evidence is sufficient ... It is not for the court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. These are functions of the jury.").

*U.S. v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).

### B.  Rule 33

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Although the standard of review for a motion for a new trial is broader than that for acquittal, motions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003) (citing *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977)). In addressing the standard of review applied to a Rule 33 motion asserting that a verdict is against the weight of the evidence, the Third Circuit has explained:

"A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir.2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir.1994)). "Thus, '[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases.'" *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir.2003) (alteration in original) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir.1987)). When evaluating a Rule 33 motion, the district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150.

*United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014). Where a defendant argues that the cumulative effect of trial errors denied the defendant a fair trial, "[a] new trial is required on this basis only when the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Copple*, 24 F.3d 535, 547 (3d Cir. 1994) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (internal quotation marks omitted)).

## III.    DISCUSSION

Johnson's motion is predicated upon four central arguments.  First, she contends that this Court erred in unduly restricting her cross-examination of Agents Rogers and Thoreson in violation of the Federal Rules of Evidence and her constitutional rights.  Second, she maintains that the evidence of intent to commit healthcare fraud was legally insufficient, and no rational jury could have found her guilty of that offense while also acquitting her of the conspiracy charge.  Third, she asserts that the prosecutor's misconduct during closing arguments and the doctrine of cumulative error require that she receive a new trial.  Lastly, Johnson argues that the verdict represents a miscarriage of justice.

Most of Johnson's arguments allege trial error but do not challenge the *sufficiency* of the Government's evidence or provide arguable grounds for a judgment of acquittal.  Because Johnson's second argument is the only one that could potentially implicate that form of relief, we address that issue first.

### A.  *Alleged Insufficiency of the Evidence and Irrational Verdict*

As noted, Johnson challenges the sufficiency of the Government's evidence as it relates to fraudulent intent.  She contends that no rational jury could have found her guilty of healthcare fraud while also acquitting her of the alleged conspiracy to engage in that fraud.  Johnson's

theory is that all of the evidence presented by the Government in support of its case concerned "team-based" practices that were "collective in nature" and "manifestations only of the overarching conspiracy." ECF No. 1829 at 12-14. In other words, Johnson argues, "the only criminal conduct ascribed to [her] is the same which constituted the conspiracy," and "[t]he same evidence underpinning the conspiracy also underpins the substantive fraud." *Id*. at 13, 14. Because the jury acquitted her on the conspiracy charge, Johnson concludes that its guilty verdict on the substantive fraud count "signals juror confusion or compromise that cannot stand." *Id*. at 14. According to Johnson, the verdict acquitting her of conspiracy necessarily "eviscerated any possibility that [she] could rationally be convicted of healthcare fraud under the same set of facts." *Id*. at 19-20. For that reason, she insists, her guilty verdict is not supported by sufficient evidence and must be vacated. *Id*. at 20.

Johnson's argument is unpersuasive. Notwithstanding the common factual proof that may have served as a basis for both the conspiracy and fraud counts, the elements of the two crimes are not the same. Under 18 U.S.C. §1347, a defendant is guilty of health care fraud when that defendant

> knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services ....

18 U.S.C. §1347(a). Thus, "the crux of a violation" of 18 U.S.C. §1347 "is the defendant's acts of misrepresentation in connection with the delivery of, or payment for, health care benefits,

items, or services." *United States v. McGill*, No. CR 12-112-01, 2016 WL 8716240, at *11 (E.D. Pa. May 13, 2016) (citing *United States v. Jones*, 471 F.3d 478, 481-82 (3d Cir. 2006)); *see also United States v. Rydze*, No. CR 12-262, 2017 WL 1337589, at *4 (W.D. Pa. Apr. 12, 2017) (discussing elements of health care fraud).

By contrast, the "the essence of a conspiracy is an agreement to commit an unlawful act." *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (internal quotation marks and citations omitted). "A conspiracy charge does not require proof of success in committing the offense (as does a substantive offense), only an agreement to commit it." *United States v. Watkins*, 339 F.3d 167, 178 (3d Cir. 2003).  Moreover, "a conspiracy charge (unlike a substantive offense) also requires proof that multiple persons agreed to commit the crime in concert." *Id*. (citing *United States v. Dansker*, 537 F.2d 40, 51 (3d Cir. 1976) ("[T]he crime of conspiracy is separate and distinct from the related substantive offense. It requires proof of the additional element of an agreement between the alleged co-conspirators. Hence, it is neither illogical nor impossible for a jury to find an alleged conspiracy nonexistent while, at the same time, convicting the defendants of the substantive offenses charged.")).  In short, it is settled law that "the crime of conspiracy is separate and distinct from a related substantive crime." *United States v. Pappas*, 445 F.2d 1194, 1998 (3d Cir. 1971) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

Even assuming, however, that the two verdicts in Johnson's case are genuinely inconsistent, that does not support her request for relief because the United States Supreme Court has long recognized that "inconsistent verdicts are constitutionally tolerable." *Dowling v. United States*, 493 U.S. 342, 353-54 (1990).  In *Dunn v. United States*, 284 U.S. 390 (1932), for example, the defendant was convicted of maintaining a common nuisance by keeping intoxicating liquor for sale at a specified place; at the same time, the defendant was acquitted of

unlawfully possessing and unlawfully selling the subject liquor.  The Supreme Court rejected the

defendant's challenge to his conviction and explained that, where genuinely inconsistent verdicts

have been reached,

> "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."

284 U.S. at 393 (quoting *Steckler v. United States*, 7 F.2d 59, 60 (2d Cir. 1925)).  The Court thus

acknowledged that "the verdict may have been the result of compromise, or of a mistake on the

part of the jury," but it admonished that "verdicts cannot be upset by speculation or inquiry into

such matters." *Id.* at 394.  *See also United States v. Dotterweich*, 320 U.S. 277, 279 (1943)

(upholding a jury verdict that found the president of a corporation guilty of introducing

adulterated or misbranded drugs into interstate commerce, despite the fact that the jury acquitted

the corporation of the same charge); *Harris v. Rivera,* 454 U.S. 339, 340, 348 (1981) (rejecting

defendant's challenge to his conviction of robbery and related offenses notwithstanding his co-

defendant being acquitted of the same offenses).

The Supreme Court expounded on the rule of *Dunn* again in *United States v. Powell*, 469

U.S. 57 (1984), where it upheld the conviction of a defendant who had been found guilty of

using the telephone in "committing and in causing and facilitating" certain felony drug offenses

(*i.e.,* conspiracy to possess with intent to distribute cocaine and possession with intent to

distribute cocaine) while also being acquitted of the predicate drug offenses.  *Id.* at 69.  The

Court discussed numerous "factors" that underlie the rule precluding defendants from

challenging inconsistent verdicts.  First, it reiterated that inconsistent verdicts do not necessarily

represent a windfall for the prosecution, since "[i]t is equally possible that the jury, convinced of

guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." *Id.* at 65. Thus, "[i]nconsistent verdicts . . . present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." *Id*. at 65. "Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal," the Court considered it "hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course." *Id*. Second, the Court explained that any attempt to make an "individualized assessment" of the jury's inconsistency "would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Id.* at 66. Finally, the Court noted "that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." *Id.* at 67. The Court did "not believe that further safeguards against jury irrationality are necessary." *Id.*

The U.S. Court of Appeals for the Third Circuit has repeatedly acknowledged the rule of *Dunn* and *Powell* when adjudicating cases in this circuit. *See, e.g., United States v. Stephen,* No. 24-1654, 2025 WL 66350, at *4 (3d Cir. Jan. 10, 2025) ("[T]he Supreme Court has explained that the only thing an inconsistent verdict can tell us is "that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that [the jurors] were not convinced of the defendant's guilt.") (quoting *United States v. Powell*, 469 U.S. 57, 64–65 (1984) (quoting *Dunn v. United States,* 284 U.S. 390, 393 (1932)); *United States v. Maury*, 695 F.3d 227, 266 (3d Cir. 2012) ("Insofar as [defendants] Prisque and Davidson attempt to argue that their acquittal on the felony charge under the Clean Water Act is inconsistent with

11

their conviction for the conspiracy, that argument is foreclosed by *Powell[.]*") (*dicta*); *United States v. Vastola*, 989 F.2d 1318, 1329 (3d Cir. 1993) (noting that *Powell* "held that jury verdicts cannot be set aside solely on the ground of inconsistency").

Pursuant to this line of authority, the verdict in Johnson's case is not reviewable. The heart of Johnson's argument is that both the conspiracy and fraud counts depended upon the same evidence and the same conduct and, therefore, her conviction of fraud cannot stand in light of her acquittal on the conspiracy charge.[1]  But this was precisely the situation in *Dunn,* where "[t]he same evidence was adduced for all three counts," and "the jury could not have convicted on the nuisance count without finding that the defendant possessed, or sold, intoxicating liquor." *Powell,* 469 U.S. at 68 (discussing *Dunn*).  As discussed, the rule annunciated in *Dunn* precludes a defendant from challenging these types of inconsistent verdicts.  Here*,* any inconsistency might well reflect the jury's judgment that Johnson was guilty of conspiracy but should be afforded leniency on that charge.

Johnson insists, however that she is not attempting to overturn her conviction based on the fact that the verdicts are inconsistent, as she recognizes that such an argument would run afoul of *Dunn* and *Powell*.  ECF No. 1829 at 20.  Instead, she contends that her verdicts are "mutually exclusive" and must therefore be vacated to avoid a miscarriage of justice.  *Id*.  In support of this argument, she refers the Court to *United States v. Randolph*, 794 F.3d 602 (6th

---

[1] *See, e.g.,* ECF No. 1829 at 13 ("[T]he only criminal conduct ascribed to Ms. Johnson is the same which constituted the conspiracy. The partial conviction therefore is not a rational result supported by the trial evidence."); *id.* at 14 ("The same evidence underpinning the conspiracy also underpins the substantive fraud. In this case, no rational jury could have reached a split verdict and for that reason it must be vacated now."); *id.* at 16 (noting that "all of the evidence the government promulgated to show Ms. Johnson's fraudulent billing was enmeshed completely with the conspiratorial conduct that she was acquitted of"); *id.* ("Because the Government's evidence and theory here were singular and unitary - each act of alleged fraud presented as an execution of the overarching conspiracy - no rational juror could convict on fraud while acquitting on conspiracy.").

Cir. 2015), a case which she considers "instructive" on "discerning between a merely inconsistent verdict, which is not reviewable under *Powell*, and a mutually exclusive verdict, which is, and must be vacated."  ECF No. 1829 at 20.

In *Randolph*, the jury found the defendant "guilty" of conspiring to engage in drug trafficking, while also indicating on the verdict form that the amounts of cocaine, crack cocaine, and marijuana "involved in the conspiracy" were "None" as to each type of drug.  On appeal, the U.S. Court of Appeals for the Sixth Circuit overturned the defendant's conviction on the conspiracy count because the jury's internally inconsistent verdict negated an essential element of the crime.  *See* 694 F.3d at 609 ("In essence, the jury found Randolph guilty of conspiracy to distribute drugs, and, at the same time, found that the conspiracy 'had' or 'included' none of the drugs charged by the government."); *id.* at 612 ("Where a jury's special verdict finding negates an essential element of the offense, the defendant must be acquitted and cannot be retried on that offense.").  Thus, "[b]ecause the jury found that none of the charged drugs were 'involved in' the conspiracy, it follow[ed] that [the defendant]" in *Randolph* "[could not] be guilty of the charged conspiracy" and was entitled to a judgment of acquittal.  *Id.*

In the context of this case, Johnson's reliance on *Randolph* is misplaced.  Key to the Sixth Circuit's decision in *Randolph* was the fact that the verdict was internally inconsistent with respect to a *single* count.  As the court explained:

> inconsistences in the same count as to the same defendant are different than *Powell* where the inconsistency is between counts. Where the inconsistency is between counts, we do not know which count the jury erred in deciding—the acquittal or the conviction. But in our situation, where the inconsistency is in the same count as to the same defendant, if we allow the government another opportunity to subject [the defendant] to factfinding proceedings going to guilt or innocence, hoping this time for a less ambiguous result, [t]hat would be a classic instance of impermissible double jeopardy.

794 F.3d at 612 (internal quotation marks and citation omitted).

In distinguishing the *Powell* line of cases, the *Randolph* court followed the logic of the

U.S. Court of Appeals for the Tenth Circuit in *United States v. Shippley,* 690 F.3d 1192 (10th Cir.

2012).  Like *Randolph*, *Shippley* involved a situation where the jury returned a general verdict

finding the defendant guilty of a federal drug-related conspiracy while also finding that the

defendant had not conspired to distribute any of the drugs listed in the indictment.  As the Tenth

Circuit described it, the jury in *Shippley* had "both convicted *and* acquitted" the defendant of the

alleged conspiracy.  794 F.3d at 611 (quoting *Shippley*, 690 F.3d at 1192) (emphasis in the

original).  The district court instructed the jury to deliberate further, which eventually resulted in

an unambiguous verdict finding the defendant guilty of conspiring to distribute 500 grams or

more of cocaine.  690 F.3d at 1194.  In his subsequent appeal, the defendant challenged the trial

court's decision to require further deliberation and argued that a judgment of acquittal should

have been entered based on the initial inconsistent verdict.  The *Shippley* Court rejected this

argument and distinguished the *Powell* line of cases, explaining:

> In our case, it wasn't just logically incongruous to enter the jury's verdict, it was metaphysically impossible. *Powell* and *Dotterweich* involved logical inconsistencies *between counts* and *between defendants.* However illogical, the verdicts in those cases could be given full effect. This case, by contrast, involves an inconsistency on the *same count with the same defendant*—an inconsistency that simply could not have been given full effect. Something had to give in our case that didn't have to give in these other cases....

794 F.3d at 611 (quoting *Shippley,* 690 F.3d at 1195–96) (emphasis in original).

Here, the Court is faced with an alleged inconsistency between *different counts* --

precisely the situation involved in *Dunn* and *Powell.*  Thus, unlike the verdicts in *Randolph* and

*Shippley,* the verdict in this case can be given full effect even if it is genuinely inconsistent.  And

contrary to Johnson's insistence, her acquittal on the conspiracy charge does not necessarily

negate the *mens rea* element of the healthcare fraud offense.  *See McGill*, 2016 WL 8716240, at

*8 (rejecting defendant's argument that "conspiracy to commit health care fraud, in violation of

§1349, and participation in a scheme to commit health care fraud, in violation of §1347, require the 'same intent,'" and noting that defense counsel "failed to point to any authority in support of this proposition"). Accordingly, the decision in *Randolph* does not support Johnson's request for a judgment of acquittal.

For the same reason, Johnson's reliance on *United States v. Pierce,* 940 F.3d 817 (2d Cir. 2019), is unavailing. In *Pierce*, the jury found the defendant guilty of conspiring to distribute and possess with the intent to distribute four types of narcotics; however, the jury also determined that the prosecution had "Not Proven" that the defendant conspired to distribute each one of the four types of narcotics at issue and had also "Not Proven" that the defendant conspired to possess with intent to distribute each one of the four types of narcotics. 940 F.3d at 818-820. The trial court eventually set aside the conviction on the conspiracy charge, and on appeal, the U.S. Court of Appeals for the Second Circuit affirmed. *Id.* at 818. The court explained that *Dunn* and *Powell*, which rejected challenges to inconsistent verdicts "as to different counts," did not resolve the "precise issue" at hand -- namely "irreconcilably inconsistent verdicts as to the same defendant on the same count of an indictment." *Id*. at 822. By contrast, the court found the decisions in *Shippley* and *Randolph* to be more factually analogous than the *Dunn* and *Powell* line of cases. *Id*. at 822-824. As in *Shippley,* the court found it "metaphysically impossible" to reconcile the conflicting verdicts. *Id.* at 824. And, like the court in *Randolph,* the *Pierce* court concluded that the appropriate remedy was to set the guilty verdict aside. *Id*. In sum, *Pierce* -- like *Randolph* -- is materially distinguishable from the case at hand where Johnson is challenging verdicts that are allegedly inconsistent "as to different counts," *id.* at 822, the very situation involved in the *Dunn/ Powell* line of authority.

Nor is this a case that involves "mutually exclusive" verdicts.  In *Powell,* the Supreme Court acknowledged an exception to its ruling in cases "where a defendant is convicted of two crimes," and "a guilty verdict on one count logically excludes a finding of guilt on the other." 469 U.S. 57 n.8. (citing *United States v. Daigle*, 149 F. Supp. 409 (D.D.C), *aff'd per curiam*, 248 F.2d 608 (D.C. Cir. 1957)). The U.S. Court of Appeals for the Third Circuit has interpreted this exception as narrowly operating only when a defendant's "*convictions* are mutually exclusive." *See United States v. Gross*, 961 F.2d 1097, 1107 (3d Cir. 1992) (emphasis in the original).  Thus, "a *defendant* may only challenge dual guilty verdicts that are inherently and fundamentally at odds with one another.  Or, to put it differently, a conviction as to one of the crimes must negate an element of the other." *Maury*, 695 F.3d at 266.  For example, in the *Daigle* case cited by the Supreme Court, the defendant could not be found guilty of both larceny and embezzlement relative to the same property, because "embezzlement involves the conversion of property that a defendant rightfully had in his possession, but did not own, and larceny involves the carrying away of a good that the defendant had no right to possess in the first place[.]" *Maury,* 695 F.3d at 265 n.30 (discussing *Daigle, supra*).

That is plainly not the situation here.  Johnson was not convicted on the two charges in the superseding indictment, and "the rule remains that, under *Dunn*, a defendant cannot challenge inconsistent jury verdicts if he was acquitted on one count and convicted on another." *Maury*, 695 F.3d at 266; *see Gross*, 961 F.2d at 1107 (rejecting defendant's argument that his acquittal was inconsistent with his convictions on other counts because, "[a]s *Powell* makes clear, inconsistency between acquittals and convictions may result from jury lenity and does not merit reversal of the convictions").  Indeed, "district courts apply this general rule where the defendant is found guilty of substantive health care fraud counts but acquitted of conspiracy to commit

health care fraud." *United States v. McGill*, Criminal Action No. 12-112-01, 2016 WL 8716240, at *8 (E.D. Pa. May 13, 2016) (rejecting defendant's argument that her conviction of health care fraud should be overturned because she was acquitted of conspiracy to commit health care fraud and the two offenses require the "same intent") (citing *United States v. Adegboye*, No. 11-0030, slip op. at 6 (W.D. Okla. Oct. 13, 2011) (denying the defendant's motion for a new trial where the jury acquitted the defendant of conspiring to commit health care fraud but convicted him of aiding and abetting health care fraud, because "the elements of the conspiracy charge are not the same as those governing the specific allegations of health care fraud, nor ... the elements required to show that the defendant aided and abetted the commission of the health care fraud" and the jury "was directed to consider each crime ... separately"), *aff'd*, 732 F.3d 1195 (10th Cir. 2013); *United States v. Shubaralyan*, No. 08-0532, slip op. at 11 (C.D. Cal. Aug. 14, 2009) (rejecting the defendant's argument that the inconsistency of her convictions of the § 1347 substantive counts of health care fraud and acquittal on the § 1349 conspiracy count was grounds for acquittal or a new trial), *aff'd*, 428 F. App'x 685 (9th Cir. 2011)); *accord United States v. Ruiz*, 386 F. App'x 530, 533 (6th Cir. 2010) (defendant's acquittal of conspiracy to distribute controlled substances was not determinative of whether she intended to promote or facilitate an unlawful activity while traveling in interstate commerce, because the two crimes were "interdependent" rather than mutually exclusive).

For all of these reasons, Johnson's verdicts are not mutually exclusive and, even if they are genuinely inconsistent, that provides no basis for the Court to review or vacate her conviction for health care fraud. Accordingly, Johnson's "avenue of relief, if any, is through a sufficiency of the evidence evaluation." *Ruiz,* 386 F. App'x at 534; *see Vastola,* 989 F.2d at 1331 ("Where there has been an inconsistent verdict, the criminal defendant is protected against jury

irrationality and error by a review of the sufficiency of the evidence.") (citing *Powell,* 469 U.S. at 67).

Here, viewing the record in the light most favorable to the prosecution, the Court has no difficulty concluding that a rational trier of fact could have found Johnson guilty of health care fraud beyond a reasonable doubt. *Smith*, 294 F.3d at 476. At trial, the Government introduced numerous recent and former employees of Hertel & Brown who testified to various billing improprieties that had occurred on a regular basis as a company-wide policy throughout the various offices of Hertel & Brown, including at the West Erie Plaza office where Johnson worked. Through these witnesses, the Government established that unlicensed technicians were regularly conducting various unauthorized types of treatment modalities with patients, such as therapeutic and aquatic exercises, electrical stimulation ("e-stim"), vasopneumatic therapy, and traction. The vast majority of the patients' treatment time was spent with a technician, but the treatments were routinely billed as though they had been rendered entirely by a licensed physical therapist. To that end, the physical therapists openly displayed their personal log-in credentials for the company's "WebPT" software.[2] Technicians could then use those credentials to log onto the WebPT account and record their treatment activities under the name of a licensed physical therapist, never documenting their own involvement with the patients. The Government also established that technicians regularly conducted group therapies or shuffled among multiple patients, at times leaving patients unattended, but this treatment time was routinely billed as though each patient had received individualized treatment from a physical therapist. Numerous

---

[2] As explained at trial, WebPT was the company Hertel & Brown utilized to electronically document its treatment of patients. N.T. Trial, April 1, 2025, ECF No. 1733 at 155:3-10 (J. Exley); N.T. Trial, April 3, 2025, ECF No. 1735 at 164:10-14 (M. Thoreson).

witnesses confirmed the fact that Hertel & Brown could never have managed its patient volume without using technicians in this manner.

The employee witnesses also established that PTAs commonly engaged in activities they were not licensed to perform independently, including aspects of patient re-evaluations or certain types of joint mobilizations.  These activities were then documented and billed as though they had been performed by a licensed physical therapist.  The witnesses discussed another common practice at Hertel & Brown, the so-called "5-minute manual" which, according to one witness, occurred when a physical therapist "placed hands on a patient for stretching and mobilization, and it was less than the required eight minutes for CPT code billing[.]"  N.T. Trial April 1, 2025, ECF 1733 at 167:24-68:1.  These "5-minute manuals" were billed as though the therapist had spent the required minimum time with the patient, even though they had not.  Through this evidence, the Government was able to establish that Hertel & Brown, its owners, and its staff members were engaged in a scheme to defraud various health care benefit programs by submitting false or inflated billing claims to various health care benefit programs so that those programs would remit inflated payments to Hertel & Brown for the healthcare services that were being billed.

The testimony of the Hertel & Brown employees was corroborated by Agent Thoreson, who reviewed and analyzed large portions of Hertel & Brown's internal business records, WebPT records, and insurance billing records.  Agent Thoreson discussed certain trends that he observed in the data, such as Hertel & Brown's unusually high patient volume compared to other local physical therapy practices, the fact that Hertel & Brown seemed to bill only for one-on-one treatments (as opposed to group therapies), and the fact that there were numerous instances of "impossible" billing (where the practice billed for more treatment time than was possible based

on the number of clinicians on hand and the office's hours of operation). N.T. Trial, April 3, 2025, ECF No. 1735 at 174:21-175:18, 177:16-21. Agent Thoreson also noted that the technicians' names, initials, or signatures were never documented in the records he reviewed, meaning that a person looking at Hertel & Brown's WebPT notes would have no way of knowing about the technicians' involvement with the patients. *Id.* at 177:8-15.

Given the enormous amount of data the Government had secured in its investigation, Agent Thoreson narrowed his analysis by focusing on approximately 150 to 200 different treatment dates across the five Hertel & Brown offices where patient volume had been especially high. *See id.* at 180:3-181:21. With respect to the West Erie Plaza office where Johnson worked, Agent Thoreson discovered dozens of "impossible billing" dates, which were enumerated in a summary chart. *See id.* at 216:11-227:21; Govt. Ex. 105. Agent Thoreson also documented several instances where the number of patients being treated at the West Erie Plaza appeared to exceed the number of clinicians on hand, including, at times, Johnson. *Id.* at 227:22-232:6; Govt. Exs. 106, 107, and 108.

While the foregoing evidence implicated Johnson indirectly in the fraudulent billing activity, the Government presented evidence that was far more direct. For example, Agent Thoreson testified that, on July 30, 2018, the records submitted in WebPT documented approximately 9.88 hours of individualized treatment by Johnson over a span of only 4.25 hours. *See generally* N.T. Trial, April 3, 2025, ECF No. 1735 at 249:4-261:4; Govt. Exs. 124, 125, 126. Agent Thoreson further testified that, on numerous occasions that day, Johnson appeared to have finalized her treatment notes well before the claimed treatment session would have concluded. *Id.* at 254:23-257:21; *see also* N.T. Trial, April 4, 2025, ECF No. 1736 at 4:2-6:23; Govt. Exs. 124, 125, 126.

A similar incident occurred on July 1, 2019, when 425 minutes (approximately 7.08 hours) of treatment time was attributed to Johnson for a period of only 3.75 hours.  N.T. Trial, April 3, 2025, ECF No. 1735 at 261:5-267:7; Govt Exs. 127, 128 and 129; N.T. Trial, April 4, 2025, ECF No. 1736 at 14:22-16:10.  On this day as well, numerous treatment notes were signed under Johnson's name before the claimed treatment session would have ended. N.T. Trial, April 3, 2025, ECF No. 1735 at 261:5-267:7; *see also* N.T. Trial, April 4, 2025, ECF No. 1736 at 16:11-21:6; Govt Exs. 129, 130, 131.

These examples of "impossible" billing and premature completion of treatment notes suggested that Johnson was complicit in the misrepresentation of therapeutic activities and/or treatment time that ultimately inflated the company's billing records and revenue.  This conclusion was further buttressed by the fact that a July 30, 2018 treatment note attributed 48 minutes of aquatic therapy time to Johnson, yet her co-worker, Jaqueline Exley, testified that Johnson did not work in the pool area of the West Erie Plaza Office prior to the FBI's search of that facility on February 23, 2021. See N.T. Trial, April 3, 2025, ECF No. 1735 at 260:1-25; Govt Ex. 126; N.T. Trial, April 1, 2025, ECF No. 1733 at 167:11-18.  Former co-workers Carl Lewis, Lori Dowler, and Kaitlin Galleher corroborated Exley with their own observations that they had never seen Johnson working in the pool area of the West Erie Plaza office.  *See* N.T. Trial March 25, 2025, ECF No. 1728 at 212:3-6 (Carl Lewis); N.T. Trial March 26, 2025, ECF No. 1729 at 111:17-19 (Kaitlin Galleher); N.T. Trial, April 7, 2025, ECF No. 1737 at 254:3-5. (Lori Dowler).

Agent Thoreson also testified to at least two instances where treatment was attributed to Johnson at a time when Johnson was apparently off work or on vacation.  One instance occurred in August of 2019 when Johnson was in Cancun, Mexico, but treatments were nevertheless

documented in her name.  N.T. Trial, April 4, 2025, ECF No. 1736 at 39:1-42:4; Govt. Exs. 162, 163.  This was consistent with evidence relating to other PTs at Hertel & Brown - namely, Sarah Bailey, Steven Bauer, Phil Sorensen, and Jaqueline Exley -- each of whom had similarly been on vacation or out of the country at a time when treatment was documented in their names.  N.T. Trial, April 4, 2025, ECF No. 1736 at 21:7-38:25.

Another instance concerned treatment rendered on September 28, 2020.  Utilizing Government Exhibits 111 through 117, Agent Thoreson explained that an electronic treatment note was signed under the WebPT account of Johnson at 3:58 p.m.; however, the WebPT calendar indicated that Johnson had gone off work that day sometime around 2:45 p.m.  *See generally* N.T. Trial, April 3, 2025, ECF No. 1735 at 234:12-249:3; Govt. Exs. 111, 112, 113, 114, 115, 116, 117; *see also* N.T. Trial, April 4, 2025, ECF No. 1736 at 6:24-12:19.

Jacqueline Exley was a therapist and former technician at Hertel & Brown who began working at the West Erie Plaza location in 2014, alongside Johnson.  N.T. Trial, April 1, 2025, ECF No. 1733 at 151:1-3.  Exley testified that the technicians at that office would typically handle about 75-80 percent of the patient's visit, and sometimes the patient would never see a physical therapist at all, but the visits were still billed as if a physical therapist had provided the treatment.  *Id*. at 154:15-155:2. On a regular basis, technicians supervised multiple patients while conducing aquatic therapy sessions, but Exley and the other PTs would bill this time as one-on-one treatment performed by a physical therapist.  *Id*. at 156:12-157:18; *see also* N.T. Trial, April 2, 2025, ECF No. 1734 at 107:20-108:47. Exley explained that technicians would document treatment on the WebPT system using an open computer and the login credentials of a physical therapist.  N.T. Trial, April 1, 2025, ECF No. 1733 at 155:15-156:11. Johnson's computer was among those that had login credentials taped to the device, allowing other employees to record

treatment under Johnson's name that Johnson had not provided. *Id*. at 160:7-161:5; *see also id*. at 198:15-199:8, Ex. Govt. Ex. 293.  Exley acknowledged that treatment notes were sometimes finalized under her own name when she had not reviewed the documentation or treated the patient, and this occurred with other therapists as well, including Johnson.  N.T. Trial, April 2, 2025, ECF No. 1734 at 106:23-107:16.

Seth Crowell was a former technician who worked alongside Johnson at the West Erie Plaza office.  He testified that, both as an intern and later as an unlicensed technician, he worked alone with patients conducting exercises and providing e-stim, traction, aquatic therapy, and vasopneumatic treatment.  N.T. Trial March 25, 2025, ECF No. 1728 at 18:14-39:3.  He did not have WebPT credentials but would document treatments using computers that were "already logged in." *Id.* at 72:8-73:13. The patients Crowell treated spent about 85 percent of their appointment time with him, and then he would "handoff" the patient to Johnson or a different therapist who would conduct manual stretching or an ultrasound on the patient for the remainder of the appointment.  *Id*. at 37:10-19, 39:10-40:1.

Carl Lewis was a former technician and, later, a PTA at Hertel & Brown from 2017 to 2021.  He testified that, as a technician, he treated patients at the West Erie Plaza office with hot packs, e-stim, and vasopneumatic devices, conducted therapeutic and aquatic exercises, and performed cervical and lumber traction.  N.T. Trial March 25, 2025, ECF No. 1728 at 179:18-182:24, 184:13-186:14.  Lewis testified that he was unsupervised "more often than not" and, when conducting aquatic therapy, he was "more frequently" by himself, supervising multiple patients who were in the pool at the same time.  *Id*. at 184:13-186:4, 187:11-13. Johnson and the other therapists had their personal login credentials openly displayed, so he was able to use their credentials to obtain patient "flow sheets" or document his treatments under their name. *Id*. at

182:22-184:12; *see also* N.T. Trial, April 1, 2025, ECF No. 1733 at 198:15-199:8; Govt. Ex. 293.

This evidence implicating Johnson in the fraudulent billing scheme was further corroborated by Special Agent Rogers and Professional Conduct Investigator Jones, each of whom testified about incriminating admissions that Johnson had made. Rogers interviewed Johnson on February 23, 2021, the day that agents searched her workplace and the other offices of Hertel & Brown. According to Rogers, Johnson admitted that she and other physical therapists were billing for treatments that had been conducted by PTAs or technicians. N.T. Trial April 2, 2025, ECF No. 1734 at 197:1-17; 269:15-20. Sometimes Johnson would be working with other patients while the PTA or tech treatment was occurring, and both sets of treatment would be billed as if Johnson had performed the treatment. *Id*. at 197:18-198:4. Johnson acknowledged to Agent Rogers that technicians are not licensed healthcare professions and cannot treat patients or bill for such treatment; yet therapeutic exercises were primarily being conducted by technicians. *Id*. at 198:5-17; 202:25-203-6. Johnson explained that the owners wanted technicians to perform these services. To that end, technicians were being trained to treat patients and were conducting their treatments in an open area where they were visible to Johnson and others. *Id*. at 198:21-200:5; 205:13-206:2. In addition to therapeutic exercises, technicians were performing heat and ice modalities, stimulation, manipulations, and pool activities. *Id*. at 204:1-13. All of these therapies were billed as though they had been performed by a physical therapist. *Id*. at 204:14-17; 206:3-6. Johnson also acknowledged to Agent Rogers that she had witnessed PTAs perform manipulations that they were not licensed to perform. *Id*. at 203:7-25. These were billed by Hertel & Brown as though a licensed physical therapist had conducted the manipulation. *Id*. at 204:18-21.

Johnson told Agent Rogers that it was common practice at Hertel & Brown for group sessions to be billed as individual therapies. N.T. Trial April 2, 2025, ECF No. 1734 at 200:19-22. This was in accordance with a directive from Hertel & Brown's management to bill everything as individual therapy. *Id*. at 199:9-200:6. Johnson disclosed to Agent Rogers that the physical therapists and PTAs had expressed concern over these billing practices, but nothing was changed and the billing practices continued. *Id*. at 206:12-24. According to Rogers, Johnson indicated that she and the other employees at Hertel & Brown "turned a blind eye to what was going on." *Id*. at 201:7-202:12. Johnson advised Agent Rogers that the motivation behind all these billing practices was "profit and greed," as they enhanced the profitability of the practice. *Id*. at 202:13-21; 205:1-12.

Investigator Jones interviewed Johnson at her workplace in May of 2021 and questioned her about the billing practices that had been going on at Hertel & Brown prior to the agents' search of the premises on February 23, 2021. Johnson acknowledged to Investigator Jones that unlicensed technicians had been conducting group therapies with patients and performing various treatment modalities such as aquatic therapy, exercises, electronic stimulation, and joint mobilizations. N.T. Trial, April 3, 2025, ECF No. 1735 at 18:1-21:21. These treatments and modalities were then billed by Johnson and other PTs as if the therapists had performed them themselves. *Id*. at 18:16-23, 21:5-25; *id*. at 49:20-24. Johnson explained that therapists' usernames and passwords were taped to the laptops at her office, so that anyone could access them. *Id*. at 22:4-13. Also, physical therapists provided worksheets to the techs as a way of training them to perform these modalities. *Id*. at 19:16-20:7. Johnson acknowledged to Investigator Jones that she had been fully aware of these practices at the time they were occurring and had participated in them herself. *Id*. at 18:5-19:2, 21:22-25, 49:3-50:2, 56:2-13.

Although she knew at the time that these practices were impermissible and that the techs should not have been treating patients, she stated that the owners had directed it to be done. *Id*. at 19:1-2, 16-20; 20:1-2; 22:24-23:6, 49:3-50:2, 56:2-13.

The Government also produced evidence that Johnson was complicit in billing for "5-minute manuals." One such witness was Kaitlin Galleher, who worked at Hertel & Brown first as a student intern and later as a licensed physical therapist. N.T. Trial March 26, 2025, ECF No. 1729 at 36:23-40:18. Galleher testified that, while working with Johnson at the West Erie Plaza office, she observed Johnson performing "5-minute manuals." *Id*. at 40:19-41:2, 111:8-16.

Exley also observed Johnson performing "5-minute manuals." She recalled the owners instructing staff that "everybody gets a manual," and "if your hands are on a patient, you're billing for a manual." N.T. Trial, April 1, 2025, ECF No. 1733 at 170:7-8; *id*. at 173:2-3. Exley estimated that probably 95 percent of the West Erie Plaza patients received manual therapy of some duration and at least half of those were "5-minute manuals." *Id*. at 170: 5-13. She testified that she and the other PTs at the West Erie Plaza, including Johnson, were performing "5-minute manuals" "[p]retty often throughout the day" on a daily basis, while documenting some period of time between 8 to 22 minutes so that the manual could be billed as a full unit. *Id*. at 171:2-172:18, 174:16-20; *see also* N.T. Trial, April 2, 2025, ECF No. 1734 at 105:1-4 ("[I]n regards to the manual therapy that we had talked about before. We would often estimate the amount of time spent in manual therapy, whether... [the] amount of time was accurate or not."). Exley stated that, in the ten years she worked with Johnson prior to the FBI "raid," she never saw Johnson use her phone to time a manual. N.T. Trial, April 1, 2025, ECF No. 1733 at 226:5-19. Exley even recalled an instance where Johnson treated a patient with a hip fracture and, although the patient

26

could tolerate only 90 seconds of stretching, the treatment "was billed as a manual therapy." *Id*. at 225:23-226:4.

Lori Dowler, a PTA at the West Erie Plaza office, also observed Johnson performing "5-minute manuals." N.T. Trial, April 7, 2025, ECF No. 1737 at 242:3-243:12.  Additionally, Dowler testified that Johnson was one of the physical therapists who instructed her on how to do complete patient re-evaluations, a function she was not licensed to perform. *Id*. at 243:13-244:22; *see also* N.T. Trial, April 1, 2025, ECF No. 1733 at 144:20-21 (Exley explaining that "Physical therapy assistants are not able to complete re-evaluations independently")). Dowler testified that she performed complete re-evaluations on a daily basis as a "common practice" because "it was expected of [her]."  N.T. Trial, April 7, 2025, ECF No. 1737 at 243:19-244:22, id. at 245:10-12. Because she was not licensed to be perform complete re-evaluations, Dowler would regularly document these procedures under the names of a physical therapist, utilizing the user-names and passwords that the PTs displayed on their computer.  *Id*. at 245:10-246:11.

The Government also introduced evidence suggesting that Johnson had a financial incentive to commit health care fraud and that she benefitted from the fraudulent billing scheme at Hertel & Brown.  According to Jaqueline Exley, management at Hertel & Brown stressed the importance of patient volume as a way for employees to earn quarterly bonuses.  N.T. Trial, April 1, 2025, ECF No. 1733 at 179:18-180:6.  Evidence of Johnson's earnings confirmed that she materially benefitted from her role in the fraudulent billing scheme.  According to Agent Thoreson, Johnson received a $16,164 bonus in 2018, which was equivalent to twenty percent of her base salary for that year.  N.T. Trial, April 4, 2025, ECF No. 1736 at 88:22-89:10, 91:25-92:8; Govt. Ex. 213.  In 2019, Johnson received a bonus of $12,965, an amount equal to approximately 16.5 percent of her $78,481 salary for that year.  *Id*. at 86:14-25, 87:18-88:2; *see*

*also* Govt. Ex. 212.  In 2020, she received a $12,223 bonus which was the equivalent of approximately 15 to 16 percent of her salary.  N.T. Trial, April 4, 2025, ECF No. 1736 at 71:11-73:4, 80:24-81:11; Govt. Ex. 211.

Finally, as the Government points out, even certain defense witnesses corroborated aspects of the prosecution's case.  Andrew Angert, an unlicensed technician who worked alongside Johnson, admitted that he conducted therapeutic exercises and performed e-stim, vasopneumatic treatments, and traction on Johnson's patients.  N.T. Trial April 10, 2025, ECF No. 1739 at 164:1-165:2.  Mr. Angert confirmed the fact that Hertel & Brown could not have managed its high patient volume without using technicians in this manner.  *Id*. at 164:16-19.  Deborah Lindabery confirmed that, under Pennsylvania law, unlicensed technicians cannot treat patients and physical therapists cannot bill for such treatment. N.T., Trial, April 15, 2025, ECF No. 1741 at 72:13-19.  As an example, Ms. Lindabery testified that, if a technician was conducting exercises with multiple patients at the same time while the physical therapist was doing something else, it would be improper for the physical therapist to bill for the technician's treatment time.  *Id*. at 73:16-24.  Similarly, it would be improper for the physical therapist to bill for a technician's time supervising aquatic therapy if the physical therapist was not in the pool area. *Id.* at 73:25-74:16. Ms. Lindabery also confirmed that group therapies cannot be billed as one-on-one treatment.  *Id*. at 81:2-18.

Collectively, this evidence constituted legally sufficient proof that Johnson was guilty of health care fraud beyond a reasonable doubt. Based on the available evidence, a rational jury could permissibly find that Johnson, acting with fraudulent intent, knowingly and willfully participated in a scheme to obtain monetary payments from one or more health care benefit programs by making false or fraudulent representations in connection with the delivery of and/or

payment for health care benefits and services.  *See* 18 U.S.C. §1347(a); *see also* Third Circuit

Model Criminal Jury Instructions, §6.18.1347.[3]  Accordingly, Johnson's motion for a judgment

of acquittal will be denied.

### B.  Alleged Errors Concerning Johnson's Cross Examination of FBI Agents

Johnson also requests a new trial based upon what she considers to be improper

limitations by this Court on her attempts to cross-examine Agents Rogers and Thoreson.  At trial,

both agents testified about the circumstances of Johnson's interview on February 23, 2021.

Relevantly, Agent Rogers' 302 report[4] reflects that Johnson initially provided non-

incriminating information about her employment at Hertel & Brown during the first part of her

interview.  Johnson summarizes that portion of the 302 report in her reply brief.  *See* ECF No.

1945 at 11-12.  She describes her initial statements to Agent Rogers as disclosing:

> that she bills daily for treatment, but that billing is handled by Patty Berchtold and
> Lindsay Berrington, who are billing specialists; that the WebPT system
> automatically assigns billing codes and will not allow a therapist to sign a note if
> there is an error in billing; that she is not aware of WebPT having an override option
> for billing or signing notes; that she has never been asked or required to perform
> any tasks that she is not comfortable with; that she is not directed by Brown or
> Hertel to treat a patient outside her own evaluation and treatment plan; that she did
> not receive any employee training when she started at Hertel and Brown; that
> technicians follow directions from Physical Therapists and Physical Therapy
> Assistants and they can assist with patient exercises but that "[t]echnicians do not
> bill for any services" and "[t]echnicians are not licensed health professionals"; that
> she was never told to document individual therapy sessions when group therapy
> sessions were actually provided; that she has not instructed unlicensed staff to
> perform therapy on patients; that she does not share her login and password with

---

[3] There was no factual dispute at trial, and Johnson does not currently dispute, that the defrauded
entities in this case (including, among others, Medicaid, Medicare, Highmark Blue Cross Blue
Shield, UPMC, Aetna, and TriCare) were "health care benefit program[s]" within the meaning of
18 U.S.C. §1347(a), and that they constituted "public or private plan[s] or contract[s], affecting
commerce, under which ... medical benefit[s], item[s], or service[s] [were] provided" to Hertel &
Brown's patients, as defined in 18 U.S.C. §24(b).

[4] The 302 report contains personal data identifiers and is currently filed under seal at ECF No.
1947.

anyone; and that she is not aware of any complaints from college professors or any outside complaints about Hertel and Brown Physical Therapy employing technicians to perform physical therapy treatments.

ECF No. 1945 at 11-12.

The 302 report states that, at a certain point in time, Agent Thoreson "joined the interview" and "informed Johnson that he [knew] that therapy was being directed by Physical Therapists and performed by unlicensed technicians and billed as if a Physical Therapist performed the treatment." ECF No. 1947 at 7 (under seal). Agent Thoreson further advised that he was aware group sessions were being billed as individual therapy sessions. *Id.* He then "discussed the importance of answereing [sic] questions honestly and completely and asked Johnson if she wanted to clarify any of he[r] previous statements." *Id.* Johnson "was provided time to think about Thoreson's comments and given the opportunity to speak further if she wished." *Id.*

After Thoreson exited the interview, Johnson made incriminating admissions to Rogers, as set forth in the latter portion of the 302 report. ECF No. 1947 at 7-11. Rogers later testified about Johnson's incriminating admissions, as discussed in more detail above.

On cross-examination, Johnson's attorneys sought to question Agent Rogers about the initial portion of the interview preceding Agent Thoreson's involvement. The Court restricted defense counsel from introducing Johnson's initial statements to Rogers on the grounds that they were inadmissible hearsay evidence.

Johnson's attorneys also sought to question Agent Thoreson about an email he had written in March of 2021 wherein he indicated that Johnson was denying some of the admissions attributed to her by Rogers. The Court precluded this line of questioning as well, after concluding that the contents of the email were inadmissible hearsay.

Johnson contends that these restrictions improperly "precluded her from correcting the false and highly prejudicial impressions created by [the agents'] incomplete and misleading testimony to the jury," which, she claims, "highlighted only inculpatory statements ascribed to her and excluded all of the statements that exculpated her as well." ECF No. 1829 at 6. Johnson insists that she should have been able to utilize the entire FBI 302 to provide the jury "essential context" about what she said to Rogers in "describing the practices at Hertel and Brown and what she understood those practices to mean at the time she participated in them." *Id.* She adds that she should have been able to cross-examine the agents about "the circumstances under which she made certain statements so that the jury could assess the credibility of the agents' renditions of them." *Id.* The Court's ruling, she argues, wrongly applied the holding of *United States v. Williams*, 930 F.3d 44 (2d Cir. 2019), in a manner that violated Federal Rule of Evidence 106 as well as her constitutional rights. *Id.* at 8. In this Court's view, these arguments lack merit.

Federal Rule of Evidence 106 provides that, "[i]f a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part--or any other statement--that in fairness ought to be considered at the same time. The adverse party may do so over a hearsay objection." In 2023, Rule 106 was amended in two respects that are relevant to the Court's analysis.

First, where completion is required under existing fairness standards, the "completing statement" is now admissible over a hearsay objection. *See* Fed. R. Evid. 106 Advisory Committee's Note to 2023 Amendment ("The Committee has determined that the rule of completeness, grounded in fairness, cannot fulfill its function if the party that creates a misimpression about the meaning of a proffered statement can then object on hearsay grounds

and exclude a statement that would correct the misimpression.") (citation omitted).  As an

illustration of this principle, the Advisory Committee proffers the following scenario:

> [A]ssume the defendant in a murder case admits that he owned the murder weapon, but also simultaneously states that he sold it months before the murder. In this circumstance, admitting only the statement of ownership creates a misimpression because it suggests that the defendant implied that he owned the weapon at the time of the crime -- when that is not what he said. In this example the prosecution, which has created the situation that makes completion necessary, should not be permitted to invoke the hearsay rule and thereby allow the misleading statement to remain unrebutted. A party that presents a distortion can fairly be said to have forfeited its right to object on hearsay grounds to a statement that would be necessary to correct the misimpression. ...

Advisory Committee's Note to 2023 amendment.

Second, Rule 106 now applies to all statements, including unrecorded oral statements.

An important caveat, however, is that

> [a] party seeking completion with an unrecorded statement would of course need to provide admissible evidence that the statement was made. Otherwise, there would be no showing that the original statement is misleading, and the request for completion should be denied. In some cases, the court may find that the difficulty in proving the completing statement substantially outweighs its probative value--in which case exclusion is possible under Rule 403.

*Id.*

Rule 106, in its current iteration, is meant to displace the common-law rule of

completeness. *Id.* Yet,

> [t]he amendment does not give a green light of admissibility to all excised portions of statements. It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression. The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106. **So, for example, the mere fact that a defendant denies guilt before later admitting it does not, without more, mandate the admission of his previous denial.** *See United States v. Williams*, 930 F.3d 44 (2d Cir. 2019).

*Id.* (bold emphasis added)

In *Williams*, cited in the advisory committee notes above, the U.S. Court of Appeals for

the Second Circuit addressed Rule 106 and the "doctrine of completeness" in the context of a

defendant, Andy Williams, who was convicted of being a felon in possession of a firearm.

Williams was initially arrested for unauthorized use of a rental car, speeding, and reckless

driving, but during an inventory search of the car, police officers discovered a loaded firearm.

When Williams was questioned about this, he initially denied knowing anything about the

weapon and claimed he was merely trying to return the car.  Detectives then asked him who the

gun belonged to and whether he was "trying to tell us something like it belongs to your

girlfriend."  930 F.3d at 58.  At that point, Williams acknowledged that the weapon belonged to

him, and he signed a written statement confirming that he "had the gun." *Id*.  In a pretrial ruling,

the district court barred Williams from introducing the first portion of his post-arrest statement in

which he basically denied knowing anything about the firearm and claimed he was merely trying

to return the car.

On appeal, the Second Circuit found no abuse of discretion in the trial court's ruling.  "To

require completion under the doctrine of completeness," the court explained,

> Williams had to demonstrate that admission of his initial statements denying
> ownership of the gun was "necessary to explain" his later statements that the gun
> was his, "to place [these statements] in context, to avoid misleading the jury, or to
> ensure fair and impartial understanding" of these later statements.

930 F.3d at 60 (citation omitted).  Williams had not done so because, essentially, his confession

was "simply a reversal of his original position." *Id*. at 61 (citation omitted).  The court explained

that it is "not uncommon for a suspect, upon interrogation by police, to first claim in a self-

serving manner that he did not commit a crime, only thereafter to confess that he did." *Id*. "But

the rule of completeness does not require the admission of self-serving exculpatory statements in

all circumstances, ...," and the mere fact that a suspect denies guilt before admitting it, does not—

without more—mandate the admission of his self-serving denial." *Id*.

33

In the present case, the prosecution sought to introduce testimony about Johnson's admissions to Rogers, while excluding her initial self-serving statements. This Court agreed that the portions of Johnson's interview that preceded Thoreson's involvement were inadmissible. The Court first determined that the actual 302 report could not come into evidence, because it was neither a business record nor a public report.  N.T. Trial, April 2, 2025, ECF No. 1734 at 145:13-16; Fed. R. Evid. 803(6) (Records of a Regularly Conducted Activity); Fed. R. Evid. 803(8) (Public Records). The Court then ruled that Johnson's attorney could not ask Agent Rogers about the non-incriminatory statements Johnson made in the first part of her interview. The Court analogized Johnson's interview to the confession at issue in *Williams*.  *Id.* at 164:12-165:8. The Court explained that, while Johnson's eventual confession was "not a precise reversal" of her earlier statements, the interview as a whole was basically "a lack of admission and then an admission," *id*. at 165:1-2, and Johnson's initial "lack of admission" did not explain her later admission. *Id*. at 165:2-3.

The Court also restricted defense counsel's attempt to introduce evidence of an email chain that Thoreson and Rogers had exchanged on March 10, 2021.  In one email, Thoreson informed Rogers that he had "revisited" Johnson and that "Julie claimed she never told you she knew things were being done wrong at Hertel [& Brown] and that she never said anything about greed with the owners."  Defense counsel sought to utilize this email on cross-examination, under the theory that

> It's the first opportunity where [Johnson is] confronted with the statements.  She says, wait a second, I never said that.  ... [G]iven the testimony ... at the suppression hearing, that she did feel like she couldn't leave, that she did feel like she was in custody, there are real questions about the circumstances under which that alleged statement was actually elicited.

N.T. Trial April 2, 2025, ECF No. 1734 at 165:12-21.  The Court precluded defense counsel from introducing the email chain or questioning the agents about it on the grounds that the email

contents were inadmissible hearsay.  *Id.* at 167:11-18; *see also* N.T. Trial, April 7, 2025, ECF No. 1737 at 159:6-10.

Johnson contends that the Court erred in restricting the scope of her cross-examination on these matters.  She insists that the entirety of her statements were "essential to put her admissions into context given the government's theory and presentation of the case to the jury."  ECF No. 1829 at 8.  According to Johnson, her "full statement" contained her "repeated attempts to explain to the agents - first, Agent Rogers for over an hour, then Agent Thoreson on two occasions when he joined the interrogation - that she did not know what she was doing was wrong **at the time she had committed the improper billing conduct** and, on a later occasion, that the contents of the 302 were not accurate...."  *Id.* at 9 (emphasis in the original). Johnson asserts that "the entirety of [her] statement" had to be placed in evidence so that the jury "could determine for themselves whether Ms. Johnson indeed confessed to the conduct or not..." *Id.*  By errantly restricting the scope of her cross-examination, Johnson argues, the Court "improperly and prejudicially exclude[d] her exculpatory statements."  *Id.*

Having fully and carefully considered these arguments, the Court finds them to be meritless.  Under Rule 106, as construed by the courts in this circuit, "a second writing may be required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." *United States v. Davis*, 524 F. App'x 835, 841 (3d Cir. 2013) (citing *United States v. Soures*, 736 F.2d 87, 91 (3d Cir. 1984)).  The rule does not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted.  *Soures*, 736 F.2d at 91. Thus, "[w]hile a party may offer as an admission the statement of an opponent contained in a document, the opponent may not offer their own remaining

statements in the document as evidence unless such statements are necessary for completeness."

*Travillion v. Wetzel*, No. 24-1763, 2025 WL 971669, at *3 (3d Cir. Apr. 1, 2025); *see also*

*United States v. Robinson*, Criminal Action No. 25-22-1, 2025 WL 3188395, *3 (E.D. Pa. Nov.

14, 2025) (noting that Rule 106 "does not authorize admission of all self-serving narrative; the

touchstone remains whether the additional portions are necessary to prevent distortion"));

Advisory Committee Notes to 2023 Amendments (noting that the rule "applies only to the

narrow circumstances in which a party has created a misimpression about the statement, and the

adverse party proffers a statement that in fact corrects the misimpression.").

Here, this Court remains of the view that no portion of the Agent Rogers' testimony

about Johnson's interview implicates the concerns that Rule 106 is intended to address.  At the

heart of Johnson's argument is her disagreement with the manner in which this Court has

interpreted Agent Rogers' 302 report.  Johnson intimates, for example, that she repeatedly tried

to tell Rogers that she did not know she was doing anything wrong at the time she engaged in the

improper billing practices. *See* ECF No. 1829 at 9. But this is nowhere reflected in Rogers' 302

summary, and the portions of the 302 report on which Johnson relies do not support her

argument that the omitted material constituted "completing evidence."

On the contrary, rather than clarifying her later admissions, the first portion of Johnson's

interview involved a number of self-serving assertions by her that either were untrue or, if true,

were merely directly counter to her later clearly stated admissions.  For example, Johnson's

statements that two specialists oversaw the billing at Hertel & Brown, that WebPT automatically

assigned billing codes and would not allow a therapist to sign a note if there was an error, and

that she was unaware of an option to override WebPT, tended to minimize Johnson's own

personal involvement in the fraudulent billing scheme. These statements implicitly suggested

that Hertel & Brown had measures in place to ensure accurate billing, but do not explain Johnson's admitted role in inaccurately documenting the medical treatment that was being billed. Johnson's initial statement that she had not instructed unlicensed staff to perform therapy on patients did not explain, but rather, was simply materially contradicted by her later admission that technicians were "taught how to treat the patients" and were "taught how to perform exercises for patients." ECF No. 1947 at 7-8 (under seal). Johnson initially told Agent Rogers that technicians follow directions from PTs and PTAs and can assist with patient exercises but do not bill for services. This assertion did not explain, but rather, was flatly contradicted by Johnson's later admissions to Agent Rogers that technicians were treating the patients, that this treatment was being billed by Johnson and other physical therapists as their own treatment time, and that this practice was the "way it has always been done and we turned a blind eye." ECF No. 1947 at 7 (under seal). Johnson initially informed Agent Rogers that she had never been asked or required to perform any tasks that she was not comfortable with, and that she was never told to document group therapy sessions as individual therapy. These statements do not explain, but rather, simply contradict her later admission to Agent Rogers that Aaron Hertel instructed the physical therapists not to bill group sessions and to only bill as individual therapy. Johnson further admitted that all of the physical therapists raised concerns about this practice, but nothing changed after they raised the issue with the owners. ECF No. 1947 at 7 (under seal). Johnson initially told Agent Rogers that she did not share her WebPT login and password with anyone and that no staff were permitted to enter notes or sign for another PT or PTA. However, these self-serving assertions do not explain any of her later admissions and, moreover, were met with substantial contrary evidence at trial.

In sum, a fair reading of Agent Rogers' 302 report shows that Johnson essentially denied any irregular activity when initially questioned about the practices at Hertel & Brown. Then, when Thoreson confronted her with his awareness of some of the improper practices that were occurring, Johnson made incriminating admissions. Her statements in the initial portion of the interview, prior to Agent Thoreson's involvement, did not explain or clarify her later admissions. Nor was any portion of Johnson's excluded statements needed to correct an actual distortion or misimpression about the admissions she made to Agent Rogers.

Johnson insists that, part of the reason she sought to include the entirety of Rogers' 302 report was to provide "essential context" to the jury about "the circumstances under which she made certain statements so that the jury could assess the credibility of the agents' renditions of them[.]" ECF No. 1829 at 6. But to the extent Johnson suggests that she was pressured into making a false confession, she fails to identify any competent evidence to support the assertion or any trial error that would justify a new trial. Nothing in Rogers' testimony, or his 302 report, suggests that Johnson was coerced or bullied into making false admissions. On the contrary, both the 302 report and the agents' testimony establish that, after Thoreson entered the interview room, he indicated his awareness of certain improper billing practices that were occurring at Hertel & Brown and then advised Johnson about the importance of being truthful in her answers. There was nothing inherently improper about Thoreson's conduct, and Johnson's attorneys were allowed to question the agents about the atmosphere of the West Erie Plaza office on the day of the search and the circumstances surrounding Johnson's interview. In addition, counsel were permitted to cross-examine the agents about the comments that Thoreson made to Johnson when he advised her to be truthful in her answers. The only restriction placed on defense counsel in that regard was the Court's admonition that counsel could not get into the substance of Johnson's

self-serving statements when examining the agents about their own conduct.  For the reasons discussed, this Court remains of the view that Johnson's initial self-serving statements to Rogers were not "completing" evidence subject to Rule 106.  And because it is *Johnson's* "completing" remarks -- not the *agents'* remarks or conduct -- that are relevant to a Rule 106 analysis, this line of argument does not establish any violation of the rule that unfairly impaired Johnson's defense.

To the extent Johnson disputes the accuracy of the 302 report or otherwise contests the admissions that Rogers attributed to her, she again fails to establish a Rule 106 violation or any grounds for a new trial.  In order to introduce an oral unrecorded statement as "completing" evidence, Johnson was required to establish, through admissible evidence, that the "completing" statement was in fact made.  *See* Advisory Committee Notes to 2023 Amendment ("A party seeking completion with an unrecorded statement would of course need to provide admissible evidence that the statement was made. Otherwise, there would be no showing that the original statement is misleading, and the request for completion should be denied.").  Johnson never did so.  At trial, Johnson exercised her Fifth Amendment right not to testify, and she never produced any other admissible evidence establishing her version of the interview.

Instead, her attorneys sought to introduce Thoreson's March 10, 2021 email on cross-examination for the purpose of showing that Johnson contested Rogers' account and denied making incriminating statements about her knowledge that the billing activity she engaged in was wrongful.  To that end, defense counsel argued at trial that the email should be admitted as evidence of Johnson's "present sense impression."  The Court rejected that theory, and on further consideration of the matter, as discussed below, the Court finds no error in its ruling.

First, the contents of Thoreson's email do not constitute "completing evidence" under Rule 106.  At most, they indicate Johnson's denial of two assertions attributed to her, without

39

any further explanation or comment.  As such, they are merely contradictory, rather than clarifying or explanatory statements. They are, in essence, a post-admission denial.  But "[t]he mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106."  Advisory Committee Notes to 2020 Amendments.  Just as it is "not uncommon for a suspect . . . to first claim in a self-serving manner that he did not commit a crime, only thereafter to confess that he did," *Williams*, 930 F.3d at 61, it is also not uncommon for an individual who has made incriminating admissions to later minimize or deny those admissions. Thus, the March 10, 2021 email does not implicate the concerns of Rule 106.

Nor were the contents of the email otherwise admissible under the Federal Rules of Evidence.  Pursuant to Rule 803(1), a party may introduce into evidence "[a] statement describing or explaining an event or condition made while the declarant as perceiving the event or condition, or immediately thereafter."  A hearsay statement may be admitted under this exception "if it explains or describes an event personally witnessed by the declarant, and if the declaration is made essentially contemporaneous to witnessing the event."  *United States v. Green*, 556 F.3d 151, 155 (3d Cir. 2009) (citing authority).  As our Court of Appeals has explained:

> The fundamental premise behind this hearsay exception "is that substantial contemporaneity of event and statement minimizes unreliability due to [the declarant's] defective recollection or conscious fabrication." … "The idea of immediacy lies at the heart of the exception," thus, the time requirement underlying the exception "is strict because it is the factor that assures trustworthiness." …  Put differently, the temporality requirement must be rigorous because the passage of time—or the lack thereof—is the effective proxy for the reliability of the substance of the declaration; hence the greater the passage of time, the less truthworthy the statement is presumed to be, and the more the scales should tip toward inadmissibility. …

*Green*, 556 F.3d at 155–56 (cleaned up; alteration in the original).  Although no precise temporal limit exists for purposes of determining whether a statement constitutes a "present sense impression," even a gap of approximately forty minutes between the subject event and the declarant's statement is likely too long.  *See United States v. Mitchell,* 145 F.3d 572, 577 (3d Cir. 1998) (where robbery occurred between 9:00am and 9:15 a.m. and notes were found in getaway car a mile from the crime scene at approximately 10:00 a.m., intervening lapse was "probably too long for applicability of the present-sense impression[,] ... which requires the statement to be made virtually contemporaneously with the event being perceived").

In this case, Johnson's statements to Thoreson, as embodied in Thoreson's March 10, 2021 email, constitute double hearsay that was not admissible under any exception in the Federal Rules of Evidence.  Thoreson's email is itself a form of hearsay, and Johnson's reported remark about her prior interview on February 23, 2021 is not a "present sense impression" of that interview.  The lack of contemporaneity and Johnson's opportunity to reflect on her prior interview render her remarks less trustworthy, particularly in light of her motive to minimize any incriminating statements she may have made to Agent Rogers.  *See, e.g., Green*, 556 F.3d at 157 (noting that "the fundamental premise behind the present-sense impression exception" is that "contemporaneity ensures reliability because there is no time for deliberate fabrication"); *United States v. Matta-Quinones,* 621 F. Supp. 3d 264, 268 (D. Puerto Rico 2022) (ruling that the defendant's self-serving post-arrest statements were not admissible as present sense impressions, where the "time lapse between the pertinent event and [the defendant's] statement to police officers allowed [the defendant] to formulate a favorable response, eroding the reliability of [his] statements").

In sum, the Court is not persuaded that it misapplied Federal Rule of Evidence 106 when it precluded defense counsel from delving into Johnson's self-serving statements to Agents Rogers and Thoreson. And, as in *Williams*, "[t]he analysis here is also sufficient to explain why [Johnson's] Fifth Amendment claim is meritless." 930 F.3d at 61.

Johnson cites *United States v. Marin,* 669 F.2d 73 (2d Cir. 1982), for the proposition that "when the government offers in evidence a defendant's confession and in confessing the defendant has also made exculpatory statements that the government seeks to omit, the defendant's Fifth Amendment rights may be implicated." *Id.* at 85 n.6. But "even assuming *arguendo* that the Fifth Amendment is implicated in such circumstances, *Marin* itself makes clear that this is only when the statement offered by the government is *misleading* by virtue of the portion it omits." *Williams*, 930 F.3d at 61 (citing Marin, 669 F.2d at 85 n. 6) (emphasis in the original). Our own Court of Appeals has similarly noted that "the Fifth Amendment is implicated only if the evidence admitted presented a distorted picture of [the defendant's] prior statements." *Soures*, 736 F.2d 87, 91 (3d Cir. 1984).

Here, as discussed, the jury was not misled by the admission of Johnson's inculpatory statements and the exclusion of her self-serving exculpatory statements, as the latter did not explain the former. Because the incriminating evidence admitted through Agent Rogers did not present a distorted picture of the statements Johnson made during her interview, no Fifth Amendment concerns are implicated by the Court's challenged rulings. *Soures*, 736 F.2d at 91; *see also Williams*, 930 F.3d at 62 ("[T]he district court did not err in concluding that Williams's confession was not misleading and that the omitted exculpatory portions of his post-arrest statements did not explain that confession, which was 'simply a reversal of his original position.' . . . Thus, Williams's Fifth Amendment claim is also without merit.").

42

Finally, even if the Court did commit a technical error in its application of Rule 106, there is no basis for awarding the relief Johnson seeks. "Rule 33 motions are disfavored and should be 'granted sparingly and only in exceptional cases,'" such as "those in which trial errors 'so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Smith*, No. 3:24-CR-00106, 2026 WL 1216752, at *2 (M.D. Pa. May 4, 2026) (quoting *United States v. Delgado*, 367 F. Supp. 3d 286, 291 (M.D. Pa. 2019), *aff'd* 827 F. App'x 180 (3d Cir. 2020)); *see United States v. Thorton*, 1 F.3d 149, 156 (3d Cir. 1993). Here, any error in the Court's evidentiary ruling relative to Johnson's cross examination of Agents Rogers and Thoreson did not substantially influence the outcome of the trial. As previously discussed, the Government produced abundant substantive and compelling evidence of Johnson's knowing involvement in the fraudulent billing activity at Hertel & Brown. And any evidentiary benefit that Johnson could have gained from more expansive cross examination is speculative, particularly in light of the fact that she made similarly incriminating statements to Investigator Richard Jones in May 2021. Accordingly, Johnson's request for a new trial on the aforementioned grounds must be denied.

### C. Alleged Prosecutorial Misconduct

Johnson next argues that she should receive a new trial based on the prosecutor's remarks during closing arguments and the doctrine of cumulative error. Johnson maintains that the AUSA improperly "diluted" the definition and instructions from this Court pertaining to reasonable doubt when he made the following statements during his rebuttal argument:

> The Court has instructed you that reasonable doubt is a hesitation that might cause — that you may hesitate in a matter of importance in your life. But it can't be just hesitation that you might think about in the normal context, right? Because then you wouldn't be able to deliberate. It can't just be what you might ordinarily think about hesitation because you'd have no ability to go in there and deliberate for as long as you need to figure out what happened here. So let me give you an example.

43

> You're preparing for a trip and you're getting all your stuff ready, you're packing — let's dream a little and say you're going to Hawaii. You're getting everything together, you're ironing your clothes. You pack up, you put your luggage in your car, and you start driving to the airport.
>
> You get about halfway to the airport, and you think to yourself, 'Oh my gosh, did I turn the iron off?' And you're thinking and you're thinking. And, you know, you're going away for — let's dream a little bit more and say three weeks, and you've got to have that iron off, right? You've got to satisfy yourself that that iron needs to be off.
>
> You can't really figure it out while you're driving because you're trying to pay attention to traffic, so you pull off to the side of the road or you pull into a parking lot and you think about it, right? That's you deliberating, okay? That's you determining whether you turned your iron off and giving it thought, unfettered by any of the distractions of traffic or anything else. That's what you're going to do in the jury room, you're going to deliberate. Right?
>
> You only have reasonable doubt if you turn around and go home to check your iron. If you continue on to the airport and get on your plane and go to Hawaii, you didn't have reasonable doubt that you turned your iron off.

N.T. Trial, April 21, 2025, ECF No. 1744 at 201:21-203:20.

A defendant's right to a fair trial, including the right to be free from prosecutorial misconduct, is guaranteed by the Due Process Clause of the Fifth Amendment. *See United States v. Welshans*, 892 F.3d 566, 574 (3d Cir. 2018). When a defendant seeks a new trial because of a prosecutor's closing remarks, the court must first determine whether the remarks were improper. *United States v. Eddings*, 161 F.4th 199, 212 (3d Cir. 2025) (quoting *United States v. Savage*, 85 F.4th 102, 124 (3d Cir. 2023)). If they were, the court must then assess them for harmless error. *Id.* (citing *United States v. Savage*, 85 F.4th 102, 124 (3d Cir. 2023)). In making that determination, the court must consider "'the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction.'" *Id.* (quoting *Savage*, 85 F.4th at 124). Relief is warranted only if the improper remarks prejudiced the defendant. *Id.*; *see*

*United States v. Faye*, 728 F. App'x 120, 125 (3d Cir. 2018) ("'The test for prosecutorial misconduct is whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process' in light of the entire proceeding.'") (quoting *United States v. Morena*, 547 F.3d 191, 193–94 (3d Cir. 2008)).

In this case, assuming that the AUSA's explanation of "reasonable doubt" was improper, all relevant factors establish that Johnson was not prejudiced by it.  Thus, any error in that regard was harmless.

We first consider the scope of the objectionable comments and their relationship to the entire proceeding. Here, the challenged comments by the AUSA were not extensive.  The heart of Johnson's objection involves two sentences: "You only have reasonable doubt if you turn around and go home to check your iron. If you continue on to the airport and get on your plane and go to Hawaii, you didn't have reasonable doubt that you turned your iron off."  The entire hypothetical, quoted above, constituted about five paragraphs (less than two full pages) out of some 58 total pages of argument (*i.e.,* 47 pages of initial argument and 11 pages of rebuttal argument).  *See* N.T. Trial, April 21, 2025, ECF No. 1744 at 70-116 (initial closing) and 201-211 (rebuttal).  *Cf. Eddings*, 161 F. 4th at 213 (prosecutor's improper comments were harmless where they constituted two sentences among about 50 pages of closing arguments); *United States v. United States v. Zehrbach*, 47 F.3d 1252, 1260, 1267 (3d Cir. 1995) (*en banc*) (no prejudice when challenged remarks regarding prosecutor's view of credibility and guilt of two witnesses were two sentences in closing argument that filled 40 pages of transcript); *United States v. Homer*, 545 F.2d 864, 868 (3d Cir. 1976) (no prejudice when questionable comments about sending a message to the public and other corrupt officials constituted two paragraphs in 60 pages of closing argument).  In addition, the AUSA's comments came in rebuttal to defense

45

counsel's 25-page closing argument, wherein Johnson's attorney posed various hypotheticals that, she claimed, demonstrated reasonable doubt. *See generally* N.T. Trial, April 21, 2025, ECF No. 1744 at 118-142. At one point, for example, defense counsel suggested to the jury that "[a]ny time you found yourself listening to testimony of cooperators, looking at an exhibit, looking at an exhibit while you're listening to the testimony, and you paused and you thought to yourself: Does this make sense? I don't really believe what they're saying. Or: This doesn't feel like I'm getting the whole story. Any time you felt that during this trial, you felt reasonable doubt." *See id*. at 125:11-17. The AUSA's comments were designed, in part, to counter the idea that any pause by the jury for purposes of reflection -- or even the very act of deliberation itself -- might constitute reasonable doubt. The AUSA's comments also came in response to defense counsel's comment to the jury that it "need[ed] proof certain" that Johnson "knew what she was doing was wrong and that she willfully did it anyway, and she intended in doing it anyway to break the law and to be deceitful." *Id*. at 124:5-9. Viewed in full context -- and considering the fact that the AUSA's comments came at the conclusion of a four-week trial where dozens of witnesses testified and hundreds of exhibits were shown to the jury, the Court finds that the AUSA's challenged comments were relatively limited in relation to the proceeding as a whole.

We next consider the ameliorative effect of the curative instructions that were given. Here, the Court's instructions sufficiently cured any potential prejudice that might otherwise have otherwise resulted from the AUSA's comments. Prior to the commencement of closing arguments, the Court instructed the jury on all points of law pertinent to their deliberations. This included standard jury instructions describing the Government's burden of proof, the Defendant's presumption of innocence, and the concept of reasonable doubt, the appropriateness of which are not challenged by Johnson. N.T. Trial, April 21, 2025, ECF No. 1744 at 24:18-

26:9. The jury was also told that: (i) it must follow the Court's instruction on the law in reaching its verdict, (ii) those instructions would be provided to them in written form, and (iii) if there was any discrepancy between the Court's instructions and the lawyers' comments about the law, the jury must treat the Court's instructions as authoritative. *Id*. at 20:1-3, 21:3-4, and 21:21-22:4. The Court later reiterated the latter point just prior to the Government's initial closing argument[5] and again just prior to defense counsel's closing argument.[6] After the AUSA made his rebuttal argument, defense counsel objected to the AUSA's description of reasonable doubt and requested a mistrial or, alternatively, a clarifying instruction. The Court denied counsel's motion for a mistrial but issued the following instructions to the jury:

> Okay, ladies and gentlemen. So during argument, counsel made reference to the burden of proof applicable to the largest part of this case -- not entirely all of it -- that is, reasonable doubt. You're reminded that argument by counsel is simply argument.

---

[5] THE COURT:

I'll remind you that closing arguments from counsel are just that, they are arguments. They are not evidence and they are not authoritative statements on the law. ... It's important for you to remember that you are bound by the evidence actually presented during the trial, not the representations of counsel as to what the evidence was in their closings. And the same with regard to the instructions. If there's a disparity between counsels' statements regarding what the evidence or the law is, you're to rely upon your collective memory of the evidence and my instructions as it relates to the law.

N.T. Trial, April 21, 2025, ECF No. 1744 at 69:15-70:6.

[6] THE COURT:

I'll remind the jury, as I did before ... all the closings by all counsel, defense and prosecution, are just arguments. They're not evidence and they're not authoritative statements of the law. You're going to rely upon the evidence as you recall it and rely upon the instructions as I've delivered them as the authoritative final words on those issues.
If counsel says something that's contrary to your recollection or my instructions, you go with your recollection and my instructions."

N.T. Trial, April 21, 2025, ECF No. 1744 at 117:23-118:7.

You've been provided a jury instruction regarding reasonable doubt from me orally, and you'll be provided a written copy of that instruction as well. And you're well within your rights to review that if you care to. And to the extent any argument is inconsistent with that written instruction, as I've indicated before, you ignore the argument and you rely upon the jury instruction.

N.T. Trial, April 21, 2025, ECF No. 1744 at 215:20-216:6. It is well established that "juries are presumed to follow their instructions," *Zafiro v. United States*, 506 U.S. 534, 540 (1993), and there is no basis to depart from that presumption in this case. Accordingly, the ameliorative effects of this Court's numerous curative instructions weigh against any finding of prejudice.

Finally, we consider the strength of the evidence supporting the defendant's conviction. In this case, the evidence of Johnson's guilt on the fraud count was both substantial and compelling. As outlined previously in this opinion, the Government presented numerous witnesses to support its case against Johnson. Some of the evidence was circumstantial, but several witnesses directly implicated Johnson in the wrongdoing, and two witnesses testified to her own incriminating admissions about her misconduct.

Based upon all of these factors, the Court finds that any error caused by the prosecutor's comments was harmless and did not raise doubts about the fairness of Johnson's trial. Thus, the alleged prosecutorial misconduct did not "'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding." *United States v. Morena*, 547 F.3d 191, 193–94 (3d Cir. 2008).

The three decisions relied upon by Johnson do not persuade this Court otherwise. In *United States v. Velazquez*, 1 F. 4th 1132 (9th Cir. 2021), for example, the U.S. Court of Appeals for the Ninth Circuit reversed the defendant's conviction for importing controlled substances, where the prosecutor improperly commented on reasonable doubt in a manner that trivialized its

burden of proof and the trial court failed to neutralize the prejudice caused by the prosecutor's remarks. Several factors distinguish this case from *Velazquez,* however.

First, arguably, the AUSA's principal point was not really objectionable to the extent it merely observed that the activity of deliberating was not to be confused with the existence of reasonable doubt. Simply stopping to reflect and consider, if not question, all of the evidence, as is required and expected in appropriate deliberations does not, itself, constitute a cause for finding reasonable doubt. In the AUSA's hypothetical, pulling over and stopping the car to consider and reflect on the question of whether one left the iron on or not is a corollary to the deliberation process, which is appropriate and expected, but which does not itself constitute a basis for reasonable doubt. Rather, the question of whether a juror has reasonable doubt should be determined after appropriate reflection and considerations during deliberations.

Second, the prosecutor's comments in *Velazquez* created a greater risk of diminishing the Government's burden because he repeatedly referred to "reasonable doubt" as "something" the jury contends with "every single day." *Id*. at 1137. In particular, "the government compared the reasonable doubt standard to the confidence one needs to 'have[e] a meal' or 'travel to ...court' -- without worrying about the 'possib[ility]' that one will get sick or end up in an accident." *Id*. at 1134 (alterations in the original). As the court explained, "[s]uch decisions involve a kind of casual judgment that is so ordinary and so mundane that it hardly matches our demand for 'near certitude' of guilt before attaching criminal culpability." *Id*. at 1138. Here, by contrast, the AUSA described the Government's burden of proof in terms of the confidence a person would need to travel thousands of miles from home on an extended trip, convinced that they had not created a potential fire hazard by accidentally leaving an iron on in their home. Even if inappropriate, this analogy involved a hypothetical that was far less mundane than the one

49

criticized in *Velazquez*. At the very least, it was a more apt description of the sort of doubt "that would cause [a person] to hesitate to act in matters of importance in his or her own life." N.T. Trial, April 21, 2025, ECF No. 1744 at 25:23-25 (quoting Third Circuit Model Criminal Jury Instruction 3.06).

Third, the Court's curative instructions in this case were significantly more robust than the instructions issued in *Velazquez*. In both cases, the jury was instructed on reasonable doubt and the government's burden of proof prior to closing arguments. But in *Velazquez*, the trial court gave only one curative instruction after the prosecutor initially described the reasonable doubt standard as "something that you make decisions about every single day." 1 F.4th at 1136. After that curative instruction, "the prosecutor then provided numerous improper examples that served to reduce the government's burden of proof -- all without further admonishment." *Id*. at 1139. Moreover, "the district court overruled defense counsel's second objections after the prosecutor, during his rebuttal, rehashed an identical argument that reasonable doubt was something the jurors used "every single day." *Id*. at 1140. "By overruling the objection, the [trial] court naturally left the jurors with the impression that the prosecutor's comparison of the reasonable doubt standard to an 'everyday' judgment, and that the specific examples the prosecutor furnished, were proper." *Id*. Further exacerbating the appellate court's concerns was the fact that "the prosecutor's distortion of the standard was among the last things the jury heard before they began deliberations." *Id*. This created a "high" risk that the jury believed convicting a defendant was akin to such mundane experiences as "'getting up,' 'having a meal,' or 'travel[ing] to...court[.]'"[ ] *Id*. (footnote omitted). In this case, by contrast, the challenged description of reasonable doubt was used only once, in the AUSA's rebuttal argument. The Court gave a curative instruction at the end of the AUSA's rebuttal argument, thereby eliminating any

50

risk of confusion that may have been posed by the AUSA's argument. And, in total, the Court advised the jury no less than four times that the Court's pronouncements on the law -- not the lawyers' -- were authoritative.[7]

Fourth, the strength of the prosecution's case against Johnson is a factor that materially distinguishes this proceeding from *Velazquez*. In the latter case, the government relied exclusively on circumstantial evidence to prove the defendant's guilt. The "ultimate issue" at trial was whether the government had proved beyond a reasonable doubt that the defendant knew about the drugs that had been hidden in the car he was operating. 1 F. 4th at 1141. "Because the evidence demonstrating [the defendant's] knowledge was not overwhelming, and the district court failed to neutralize the prejudice," the court of appeals concluded that it was "more probable than not that the [prosecutor's] misconduct materially affected the verdict." *Id*. (internal quotation marks and citations omitted). By comparison, the Government's evidence against Johnson in this case was substantially stronger for all of the reasons previously discussed. Given the considerable evidence that the Government marshalled in support of its case, the more limited nature of the prosecutor's challenged remarks, and the Court's multiple curative instructions, the risks articulated in the *Velazquez* decision do not pertain in this case.

---

[7] Johnson contends that "[a]bstract instructions to follow the law are of limited value when the prosecutor has already provided a vivid, memorable illustration that redefines that law in the jury's mind." ECF No. 1945 at 19 (citing *Velazquez*, 1 F.4th at 1137). She suggests that the Court should not presume the jury followed its instructions given that the prosecutor's misstatement was "the last concrete illustration the jury received before deliberations." *Id*. She also posits that the Court's instruction was insufficient because it was not contemporaneous with the prosecutor's comments, and "the damage was done during the argument itself." ECF No. 1945 at 19.

These arguments are unpersuasive. While the Court fully appreciates Johnson's concerns about the potential for prejudice in this case, the Court simply does not agree that its curative instructions were inadequate under the circumstances, or that there are reasonable grounds to assume that the jury disregarded those instructions.

Johnson's reliance on *United States v. Henry*, 545 F.3d 367 (6th Cir. 2008), is similarly unavailing.  In that case, the prosecutor suggested in his closing argument that the juror's decision about whether to convict the defendant of drug crimes was equivalent to them deciding whether they would recommend that their child take a job with the defendant.  The court concluded that, in so doing, the prosecutor essentially inverted the burden of proof by "encourag[ing] the jury to evaluate how sure they were that [the defendant] was *not* a drug dealer, as opposed to how sure they were that he *was* guilty of the crime charged beyond a reasonable doubt." 545 F.3d at 383.  Because "[n]o caring parent would recommend that their child take a job with anyone whom they remotely feared might be a drug dealer," *id.*, the prosecutor's comments "suggested that the jury should convict [the defendant] unless they were so convinced that he was not a drug dealer that they would recommend that their child enter his employ." *Id.*  Although the court found this problematic, it concluded that no reversable misconduct had occurred under the "plain error" standard of review because the government's evidence in support of the defendant's guilt was "quite substantial," and the trial judge had correctly instructed the jury as to the reasonable doubt standard, the defendant's presumption of innocence, the defendant's right to *not* present evidence in his defense, and the fact that the jury should rely on the evidence and testimony of witnesses rather than the statements or arguments of the lawyers.

On balance, the decision in *Henry* supports this Court's decision to deny Johnson's request for a new trial.  For one, the AUSA's description of reasonable doubt in this case was less problematic than the description used by the prosecutor in *Henry,* as it did not overtly switch the burden of proof to the defense.  But additionally, the Government produced a substantial quantum of evidence to support Johnson's conviction, and this Court correctly instructed the jury

on all the same matters that were material to the court's ruling in *Henry*. Consequently, the Court finds no basis in that decision for vacating Johnson's conviction.

Johnson also points the Court to *United States v. Segna*, 555 F.2d 226 (9th Cir. 1977), as persuasive authority supporting her request for a new trial. In *Segna,* the defendant was charged with first degree murder, and the only contested issue at his trial was his sanity. On appeal following the defendant's conviction, the U.S. Court of Appeals for the Ninth Circuit concluded that the prosecutor had improperly shifted the burden of proof to the defense during his closing argument when he repeatedly referenced the presumption of sanity and asked the jury to return a guilty verdict "unless [it was] convinced by scientific evidence" that the defendant was "sick and doesn't appreciate the wrongfulness of his acts." 555 F.2d at 230. Because the defendant had produced evidence at trial to rebut the presumption of his own sanity, that presumption no longer existed and could not have been a legitimate factor for the jury's consideration. *Id*. at 231. Moreover, because the contested issue of the defendant's legal sanity was "extremely close," *id.,* the court found it "highly probable that the prosecutor's argument materially affected the verdict and thereby seriously prejudiced" the defendant, warranting a new trial. *Id.* at 232.

As with *Henry* and *Velazquez,* the decision in *Segna* does not establish grounds for a new trial in this case. Even if improper, the AUSA's description of reasonable doubt in this case was substantially less egregious than the comments at issue in *Segna,* and the evidence supporting Johnson's conviction was stronger. Those factors, along with the Court's curative instructions to the jury, preclude a finding of reversible error.

Johnson also contends that the cumulative effect of the alleged trial errors in this case provides grounds for a new trial. The "cumulative error" doctrine provides that, "although certain errors do not require relief when considered individually, the cumulative impact of such

53

errors may warrant a new trial." *U.S. S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 196 (3d Cir. 2000). "In other words, under this theory, the whole is greater than the sum of its parts." *Id*. Here, the doctrine affords no grounds for relief.  For the reasons explained, the Court has determined that Johnson's various arguments are baseless, but to the extent any error arguably occurred, such error was harmless and did not deprive Johnson of a fair trial given the strength of the Government's case.

### D.  Alleged Miscarriage of Justice

Finally, Johnson argues that the trial evidence was "not merely insufficient to sustain the conviction -- it was distorted by the manner in which the government's case was framed and by the limitations placed on the defense's ability to respond."  ECF No. 1829 at 25.  Citing the alleged inconsistency of the jury's verdict, the restraints placed on her cross-examination of Agents Rogers and Thoreson, and the "government's conflation of [her] distinct pelvic-floor therapy practice with broader issues in the general physical therapy operation," ECF No. 1829 at 26, Johnson argues that the jury's guilty verdict represents a miscarriage of justice, entitling her to a new trial.  *Id*. at 25-26.  She surmises that her conviction on the substantive health care fraud count was predicated not on individualized proof pertaining to her own conduct, but on "guilt by association" and the misconduct of others at Hertel & Brown.  *Id*.

Rule 33 allows the district court to grant a new trial if "there is a serious danger that a miscarriage of justice has occurred - that is, that an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).  No such danger exists here.  Johnson's final argument for a new trial is essentially a revisitation of the points previously addressed.  For the reasons discussed, the Court finds no merit in those challenges.  As has also been discussed, the Government presented compelling evidence of Johnson's guilt on the charge of health care

fraud. Her assertion that the Government somehow improperly conflated her "distinct pelvic-floor therapy practice" with "broader issues in the general physical therapy operation" is undeveloped and rebutted by the testimony of numerous witnesses who confirmed that Johnson treated patients for conditions unrelated to pelvic-floor problems. *See* N.T. Trial, March 25, 2025, ECF No. 1728 at 24:11-25:13 (C. Lewis); N.T. Trial, March 26, 2025, ECF No. 1729 at 110:17-111:7 (K. Galleher); N.T. Trial, April 1, 2025, ECF No. 1733 at 194:4-23, 231:9-15 (J. Exley); N.T. Trial, April 7, 2025, ECF No. 1737 at 254:6-12 (L. Dowler). Accordingly, Johnson has cited no grounds for a new trial, even when the errors she alleges are considered cumulatively.

## IV.    CONCLUSION

Based upon the foregoing, Defendant's motion for acquittal or for a new trial is denied. An appropriate Order of Court follows.

Dated:  July 10, 2026

*Robert J. Colville*
Robert J. Colville
United States District Judge